OLNEY *v.* GORDON

5-3873                                          402 S. W. 2d 651

Opinion delivered May 9, 1966

*Bethell & Pearce,* By: *Donald P. Callaway,* for appellant.

*Warner, Warner, Ragon & Smith,* for appellee.

GEORGE ROSE SMITH, Justice. On June 10, 1963, the

appellees, Frederick L. Gordon and his wife, obtained a decree in Oklahoma by which they purportedly adopted the nine-day-old son of the appellant, Boyd D. Olney. That decree was entered without the father's knowledge and without any notice whatsoever to him that such a proceeding was pending. To this day, as far as the record shows, Olney has never laid eyes on his son. For almost three years he has been continuously engaged in litigation, first to learn the whereabouts of his child and then, having at last found his son, to establish his right to take the little boy home with him.

This appeal is from a decree holding that the Oklahoma adoption decree is entitled to full faith and credit in the courts of Arkansas. That means that this father is forever deprived of the right even to see his son. We hold that the chancellor was wrong in his conclusion that the Oklahoma decree is valid and therefore immune to attack.

The facts are best narrated in chronological sequence. Olney and the child's mother, Betty Ingland, were married in Kansas on June 15, 1962, and lived there until their separation in the following November. Betty filed suit for divorce in Liberal, Kansas, alleging extreme cruelty. Olney signed an entry of appearance, but he did not employ an attorney or contest the case. On February 15, 1963, the Kansas court awarded a divorce to Betty. She was then expecting a child, but the decree made no reference to that fact, merely reciting that no children had been born of the marriage.

On June 1, 1963, the Olneys' child was born in a hospital in Hugoton, Kansas, even though the city of Liberal, where Betty was living, had its own hospital. In the court below Olney testified without contradiction that he did not learn of the birth of his son until about two weeks later. By then the Oklahoma adoption decree had already been entered.

Frederick and Virginia Gordon, a childless couple,

were living in Seminole, Oklahoma, when the Olney child was born. Virginia had once worked for Herbert Hobble, a lawyer in Liberal, Kansas. Hobble told the Gordons about the Olney baby. The Gordons employed an Oklahoma attorney to handle the adoption proceeding. Betty Olney gave her written consent to the adoption. Hobble accompanied the Gordons when they went to the Hugoton hospital to obtain the baby. The hospital authorities, however, made no record of the Gordons' identity.

The adoption proceedings, in Seminole, all took place on one day, June 10, and seem, to say the least, to have been perfunctory. The petition alleged that Boyd D. Olney was the child's father, but it was asserted, and the court found, that he was not required to consent to the adoption for the reason that he had been divorced for extreme cruelty. Hence Olney was not given notice of the proceeding. Upon the filing of the petition the court ostensibly appointed a deputy sheriff to investigate the matter. This deputy (whose name Gordon did not recognize at the trial below) at once recommended, "after a proper investigation of the facts," that the petition be granted. A decree of adoption was accordingly entered.

Back in Kansas Olney learned a few days later that his son had been born in the Hugoton hospital and had been taken away by attorney Hobble and an unidentified couple. Hobble refused to disclose the name or address of his clients. Olney was compelled to file suit against Hobble to get that information. After more than a year of litigation Olney won his case in the Supreme Court of Kansas. *Olney* v. *Hobble,* 193 Kan. 692, 396 P. 2d 367 (1964).

There was some additional delay before Olney was finally told that his son was in the custody of the Gordons, who were said to be living in Irving, Texas. Actually they had left Irving, but Olney's inquiries traced them to Fort Smith, Arkansas. There Olney filed the

present petition for a writ of habeas corpus to obtain the custody of his child. This appeal, as we have said, is from a decree holding that the Oklahoma adoption proceeding is entitled to full faith and credit under the Constitution of the United States.

For affirmance of the decree the Gordons rely mainly on an Oklahoma statute which provides that although a child cannot ordinarily be adopted without the consent of its parents consent is not required from a parent who has been divorced on the ground of cruelty. 10 Okl. St. Ann. §§ 60.6 and 60.7 (Supp. 1965). Inasmuch as the Kansas divorce was grounded upon an allegation of cruelty it is argued that Olney's consent to the adoption of his child was not necessary.

This argument is without merit. In a recent case the Supreme Court of the United States unanimously declared that an adoption decree entered without notice to the child's father "violated the most rudimentary demands of due process of law" and was therefore void. *Armstrong* v. *Manzo,* 380 U. S. 545 (1965). That case controls this one.

The appellees' position might have merit if the Olney divorce decree had been rendered by an Oklahoma court. In that situation it might be said that Olney, by failing to defend an allegation of cruelty, risked the loss of his right to object to the adoption of his expected child. The divorce proceeding, however, took place in Kansas. The Kansas statutes do not purport to dispense with a parent's consent to adoption when that parent has been divorced for cruelty. K.S.A. §§ 59-2102 and 60-1610 (1964). Hence Olney had not the slightest reason to suppose that his failure to contest his wife's complaint might result in the permanent loss of his expected child. It was unquestionably a denial of due process of law, under the *Armstrong* case, *supra,* for the Oklahoma court to attempt to read the Oklahoma statute into the Kansas divorce decree. It is too plain for argument that Olney did not have notice of the proposed adoption in

the Kansas case, and hence that case cannot be used as a basis for dispensing with notice in the subsequent Oklahoma proceeding. The Oklahoma decree is void.

The appellees' other arguments do not call for an extended discussion. It is suggested that Olney's present suit is barred by our two-year statute of limitations. Ark. Stat. Ann. § 56-112 (1947). This argument overlooks the fact that the Gordons' conduct in spiriting the child away from Kansas and in failing to give the required notice of the adoption proceeding had the effect of concealing Olney's cause of action. In the circumstances he cannot fairly be accused of having slept upon his rights. The statute did not begin to run until Olney discovered the Gordons' identity. See *Kurry* v. *Frost*, 204 Ark. 386, 162 S. W. 2d 48 (1942).

Finally, counsel for the appellees argue that it would be to the child's best interest for him to remain with the Gordons, because they have cared for the infant almost all his life. Such a holding would enable the Gordons to prevail in the dispute by reason of their own misconduct (though doubtless motivated, we realize, by ill-considered advice of counsel).

In divorce cases, it is true, the best interest of the child controls the award of custody. But such cases involve disputes between parents or other blood relatives who have a recognized legal claim to the right of custody. Those precedents are not in point here. The right of natural parents to the custody of their children, as against strangers, is "one of the highest of natural rights, and the state cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent." *Woodson* v. *Lee,* 221 Ark. 517, 254 S. W. 2d 326 (1953).

In the *Woodson* case we said that "abandonment by a parent, to justify in law the adoption of his child by a stranger without his consent, is conduct which evinces a settled purpose to forego all parental duties." By that

standard Olney has certainly not abandoned his child. In the oral argument it was suggested that in the Kansas divorce proceeding Olney was remiss in not insisting that his wife's attorney insert in the decree some provision requiring Olney to support the child after its birth. That suggestion is much too unrealistic to be taken seriously. For almost three years, in the face of dismaying legal and practical obstacles, Olney has steadfastly persevered in the search for his child. Upon the facts before us it would be little short of absurd to say either that Olney has attempted to avoid his obligations as a father or that he has shown any inclination to surrender the privilege of bringing up his own son.

The decree is reversed and the cause remanded with directions that the writ of habeas corpus be issued, vesting in the appellant the exclusive right to the care and custody of his child.

HARRIS, C.J., and AMSLER, J., concur.

McFADDIN, J., dissents.

BLAND, J., disqualified.

CARLETON HARRIS, Chief Justice, concurring. I am forced to agree that, under the law, Mr. Olney is entitled to the custody of his child, though, from the record offered, I sincerely feel that the youngster would be better off to remain with the Gordons. The record, relative to Mr. Olney's background, habits, character, stability, and reputation, is indeed meager, but the evidence, such as it is, does not leave me overly impressed.

Appellant has been married twice, and each time, was divorced in less than a year. Mr. Olney admitted that he was aware of the fact that his second wife was pregnant at the time the divorce was granted; in fact, he testified that she had told him that the child would be born the last of May. He was, admittedly, aware of the fact that someone would. have. to pay the hospital

bills, but he made no arrangements to do this, nor did he make any arrangements for medical attention for the wife or unborn child. He offered no financial support whatsoever.

The parties lived in Liberal, Kansas, a small town, at the time of the divorce, and thereafter, the second wife continued to live in Liberal; Olney moved his home, but continued to work in Liberal. It is inconceivable to me that Olney would have been unable to learn of the child's birth until nearly three weeks after the event occurred. His interest only appeared to awaken after the child had been adopted by the Gordons. I can only hope, now that he is being given custody, that his interest will remain constant, and that the little boy will receive the same love and attention to which he has been accustomed, and will be properly taken care of. The prospects that this will happen are not exactly ideal. Olney states that he intends to leave the child with his sister-in-law while he is at work, and the brother and sister-in-law have four children of their own to look after.

As stated at the outset, I recognize that the law gives Mr. Olney the right to custody of this child, but I am unable, thus far, to conclude that it is for the best interests of the child himself. It is therefore, with reluctance, that I vote to reverse the case.

Ed. F. McFADDIN, Justice, dissenting. I agree with the Majority Opinion that the Oklahoma order of adoption is void insofar as concerned the appellant, Boyd D. Olney, the father of the baby concerned; but I dissent from the concluding sentence of the Majority Opinion which reads: "The decree is reversed and the cause remanded with directions that the writ of habeas corpus be issued vesting in the appellant the exclusive right to the care and custody of his child."

There is no claim by anyone that the Oklahoma order of adoption was other than valid insofar as concerns the mother of the baby. She gave her written con-

sent to the order of adoption and therefore she was bound by it. So we have a case in which the order of adoption is void as to the father of the child, but valid as to the mother of the child. In such a situation the adopting parents (the appellees, Mr. and Mrs. Gordon) stand in the shoes of the mother, and are subrogated to all of her rights. In a habeas corpus proceeding between the mother and father, the issue is always what is for the best interest of the child. *Waller* v. *Waller,* 220 Ark. 19, 245 S. W. 2d 814. The Chancery Court held that the Oklahoma decree was entitled to full faith and credit, and so the Chancery Court never passed on what was for the best interest of the child as between the appellant and the appellees. But in equity appeals, the Supreme Court tries the case *de novo* on the record, and enters the decree that should have been entered. We should therefore decide what is for the best interest of the child.

The appellees offered abundant evidence in the record now before us that the best interest of the child would be served by giving the appellees his care and custody. Mr. Gordon is a man 31 years of age, and Mrs. Gordon is 25; they have been married for eight years; they were born and reared in Oklahoma; each has a college degree; and they have no other children. Mr. Gordon is employed by the Geiger Chemical Company and has been so employed since June 1963; and they own their own home in Fort Smith. They took this little baby boy when he was a week old, and they have cared for him and nourished him ever since. The Gordons are members of the Presbyterian Church in Fort Smith, and they attend church regularly. They have insurance policies on the baby so that when he becomes of college age he will go to college. The pastor of the church testified that the Gordons were regular in church attendance, and that Mrs. Gordon taught in the Vacation Church School. The Gordons' neighbors testified as to their good standing in the community and the fine care that they take of the baby.

Opposed to that testimony there was the testimony

of Mr. Olney that he was in a position to support his child; that he had been previously married and divorced before the marriage to the mother of this baby; that he is living with a brother and sister-in-law, who have four children; and that he is expecting his brother and sister-in-law to assist him in looking after the child while he is at work. Neither the brother nor the sister-in-law testified. To take a little baby boy the age of this child away from the people who have had him since he was a week old, and give him to a man who has never known the child and who claims that he has only a brother and sister-in-law to help him look after the child: I cannot believe that such would be for the best interest of the child; and the best interest of the child is always the paramount consideration.

In trying the case *de novo* on the record, I think we should award the care and custody of the child to the appellees, Mr. and Mrs. Gordon, with Mr. Olney to have full rights of visitation. He remains the father of the child. As the child grows older change of circumstances may come about when Mr. Olney should have the boy during vacation periods from school, etc.; and when the boy becomes fourteen he could be heard to speak his own mind as regards custody. But on the present record I would certainly leave the child with Mr. and Mrs. Gordon.

It is true that the Chancery Court decided this case solely on the question of affording full faith and credit to the Oklahoma decree; and so the Chancery Court has never really passed on what was for the best interest of the child, although that was the question before the Court on which evidence was introduced, as previously stated. If it should be thought that the Chancery Court should make the initial decision as to care and custody before that issue comes to us, then I would certainly remand the case to the Chancery Court to determine what was for the best interest of the child. Setting aside the order of adoption *so far as Mr. Olney is concerned* is proper; but it does not follow that when the order of

adoption is set aside *as far as Mr. Olney is concerned,* that he should thereby have the exclusive care and custody of the child. As I have heretofore stated, the appellees stand in the place of the mother of the child on this question of the best interest of the child.

Guy Amsler, Justice, concurring. I concur in the results reached by the majority in this case but, would reverse on different grounds.

10 Okl. St. Ann. § 60.8 (Suppl. 1965) reads as follows:

"Before the court hears a petition for adoption without consent of a parent, as provided in Section 7 of this Act, the consenting parent, legal guardian or person having legal custody of the child to be adopted shall file an application setting out the reason that the consent of the other parent is not necessary, which application must be heard and an order entered thereon in which said child is determined to be eligible for adoption as set out in Section 7 hereof. Said application shall be set for hearing on a day certain and notice of such application shall be given the parent whose consent is alleged to be unnecessary. The notice of the application shall contain the name of the child, or children, for whom application for adoption is made and the date said application is set for hearing and the reason that said child is eligible for adoption without the consent of such parent, and shall be served upon such parent as summons in civil cases at least ten (10) days prior to the hearing. Provided, that if such parent resides outside of the county, such notice shall be given by registered mail at least fifteen (15) days prior to the hearing. Provided, that if the whereabouts of such parent is not known, and this fact be sworn to by the affidavit of the consenting parent, legal guardian or person having legal custody of the child, notice by publication shall be given by publishing notice one (1) time in the newspaper

having a general circulation in the county and qualified as a newspaper under the laws relating generally to service of notice by publication, which publication shall be at least fifteen (15) days prior to the date of the hearing.''

Section 7 is the statute, § 60.7, referred to in the majority opinion, which provides that consent is not required from a parent who has been divorced on the grounds of cruelty, as Olney was.

In the Oklahoma adoption proceedings it is conceded by all parties that there was no attempt made to comply with the above statute. No effort was made to serve Olney through personal service, by registered mail or publication. In fact the records of the Oklahoma adoption proceedings affirmatively show that Olney was not notified.

The Supreme Court of Oklahoma has held that service or the giving of notice, as required by § 60.8 is jurisdictional. *Copas* v. *Reents,* Okla., 365 P. 2d 983.

This court has said that a habeas corpus proceedings by a parent to obtain custody of an adopted child constitutes a collateral attack upon the order of adoption and that the only inquiry proper to be made is whether the Court ordering adoption had jurisdiction to enter the judgment. *Norris* v. *Dunn,* 184 Ark. 511, 43 S. W. 2d 77; *Hughes* v. *Cain,* 210 Ark. 476, 196 S. W. 2d 758.

With respect to the registration of foreign judgments, we have many times held that one of the two matters that may be inquired into is whether the court of the sister state wherein the judgment originated had jurisdiction. *Lewis* v. *United Order of Good Samaritans,* 182 Ark. 914, 33 S. W. 2d 53, and cases cited therein.

It is my conclusion that consistency dictates that lack of jurisdiction of the County Court of Seminole

County, Oklahoma, should be the reason for reversing this case.